Filed 9/28/22  Russo v. Andrews CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| DEBRA YARBROUGH RUSSO, Individually and as Trustee, etc. et al., <br>     Plaintiffs, Cross-defendants and Appellants, <br> v. <br> FRANK J. ANDREWS, JR. et al., <br>     Defendants, Cross-complainants and Appellants. | A155999 <br><br> (Solano County Super. Ct. No. FCS043552) |
| DEBRA YARBROUGH RUSSO, Individually and as Trustee, etc. et al., <br>     Plaintiffs, Cross-defendants and Appellants, <br> v. <br> FRANK J. ANDREWS, JR. et al., <br>     Defendants, Cross-complainants and Appellants. | A156610 <br><br> (Solano County Super. Ct. No. FCS043552) |
| DEBRA YARBROUGH RUSSO, Individually and as Trustee, etc. et al., <br>     Plaintiffs, Cross-defendants and Respondents, <br> v. <br> FRANK J. ANDREWS, JR. et al., <br>     Defendants, Cross-complainants and Appellants. | A156710 <br><br> (Solano County Super. Ct. No. FCS043552) |

Frank J. Andrews, Jr. and David O. Stroud (collectively, defendants) formed two limited liability companies with Billy Yarbrough. The companies — ASB Southport I (ASB I) and ASB Southport II (ASB II, collectively, companies) — developed residential real estate in West Sacramento. The business relationship was amicable and lucrative. As Yarbrough's health declined, his daughter, Debra Yarbrough Russo, became involved. Thereafter, the parties' business relationship unraveled, stalling completion of an ASB II development project.

This lawsuit followed. Russo and B&L Properties, II, LLC (collectively, Russo) filed a lawsuit against defendants seeking declaratory relief under the companies' operating agreements. Defendants cross-complained. After a lengthy bench trial, the trial court determined Russo misrepresented the amount of her investment in the companies in an effort to divest defendants of control and ownership. It found Russo liable for fraud, breach of fiduciary duty, and breach of contract, and it awarded defendants damages and equitable relief. It entered judgment for defendants on all but one cause of action in their cross-complaint, then deemed defendants prevailing parties on the contract claims and awarded them attorney fees and costs.

The parties appeal from the judgment and from the orders awarding attorney fees and costs. We reverse the portion of the costs order disallowing costs incurred by defendants to maintain an electronic document management database for documents produced in discovery (electronic discovery costs) and remand with directions. In all other respects, we affirm.[1]

---

[1] This matter was set for oral argument on September 30, 2021. Shortly before oral argument, the parties moved for a continuance on the grounds that they had agreed on essential terms for a settlement and needed time to document and implement the settlement. We denied the motion. Thereafter, the parties waived oral argument. Due to the parties' numerous

## BACKGROUND

We provide an overview here, and additional detail as germane to the discussion of the parties' claims. We recite the evidence in the light most favorable to the judgment. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 787.)

Yarbrough began a real estate development venture with Andrews in the 1990s. Later, Stroud joined their team. The three men had an informal and collaborative relationship, and a "prosperous track record." In 2001, Yarbrough and defendants formed ASB I. Shortly thereafter, they formed ASB II. In 2002, Yarbrough and defendants were sole members and managers of the companies. The companies' goal was to purchase land, entitle it for residential development, and sell lots to home builders. Operating agreements governed the companies. Under those agreements, Yarbrough contributed the necessary capital up to a specified cap. He owned 50 percent of the companies. Defendants — experienced real estate developers — provided the "sweat equity." They were responsible for the companies' day-to-day operations. Defendants shared ownership of the remaining 50 percent of the companies.

Yarbrough received profit distributions — comprised of a return of his capital plus interest (preferred return) — before defendants. Defendants received distributions only after Yarbrough received his preferred return. This approach — capital contributions from Yarbrough and real estate

---

requests — and supported by a showing of extraordinary good cause — we repeatedly deferred submission of the matter to enable the parties to settle the matter and dismiss the appeals. On September 15, 2022, however, the parties advised the court they were "unable to consummate a business transaction that would have resulted in dismissal of these appeals" and requested we "submit the appeals and issue [an] opinion."

3

development expertise provided by defendants — resulted in several successful deals. In early 2003, ASB I was poised to distribute profits of $29 million. Yarbrough wanted to minimize his tax liability from his share of the profit distribution and to invest in additional real estate deals in West Sacramento. The three men believed ASB II had the potential to expand its development portfolio "if additional capital could be committed."

In April 2003, Yarbrough and defendants entered a memorandum of understanding (MOU) addressing these considerations. Yarbrough's controller, Brian Voss, prepared the MOU. Under the MOU, Yarbrough agreed to make additional capital contributions in the companies, provided "that after September 2003, his collective net investment at any time shall not exceed Twelve Million Dollars." The MOU defined collective net investment (CNI) as "the sum of all capital contributed without regard to specific partnerships, less any proceeds received." The MOU also provided that an "informal ledger will be maintained to reflect [Yarbrough's] net outstanding capital balance."

Before signing the MOU, Yarbrough and defendants discussed Yarbrough's "1031 exchanges" (exchange transactions), which allowed Yarbrough to defer tax liability on distributions from ASB I by using those distributions to acquire properties that would be transferred to ASB II. Exchange transactions were available to Yarbrough because ASB I held options to purchase land needed for ASB II development.

Yarbrough and defendants agreed the exchange transactions would increase Yarbrough's capital in ASB II but, critically, *would not affect the CNI.* Voss prepared a spreadsheet "confirming the parties' discussion regarding the effect [of exchange transactions] on CNI." The spreadsheet treated Yarbrough's profits from the sale of an ASB I property as

4

"distributions" even though a portion of the profits was earmarked for use in exchange transactions. Voss shared the spreadsheet with defendants shortly before they signed the MOU. Other documents prepared around this time period treated exchange transactions as "a distribution of profits from ASB I."

In 2004 and 2005, Yarbrough completed exchange transactions: ASB I purchased five properties for $8,129,629 and transferred them directly into ASB II. Yarbrough received a credit to his ASB II capital account for $8,129,629, with interest accruing on the purchase price of each property from the date of purchase. The exchange transactions enabled Yarbrough to defer income taxes of approximately $1.7 million. Voss sent defendants informal ledgers stating the CNI. Consistent with the parties' agreement, the CNI did not include the value of the exchange transactions.

In 2005, Russo became involved with the companies.[2] Voss continued to send informal ledgers to defendants. Beginning in May 2006, the informal ledgers contained the following note: "ASB II total includes value of exchanged properties [sic] from ASB I sale proceeds and credited to Yarbrough capital total = $8,129,629." While Russo added the value of the exchange transactions to the CNI — in violation of the parties' agreement — the ledgers did not explicitly state the CNI had been increased by the value of the exchange properties, and no line item showed that the exchange transactions had "been added to ASB II but not subtracted from ASB I."

In June 2007, Russo notified defendants the $12 million CNI cap had been reached. She gave defendants an informal ledger stating the CNI balance was $12,652,548, but she did not tell defendants the exchange

---

[2] At this point, Yarbrough's health was deteriorating. In 2006, Yarbrough's family began transferring his rights in ASB II for estate planning purposes. Yarbrough died in 2008. Eventually, Russo replaced Yarbrough as the manager and member of both companies.

5

transactions had been added to the CNI total. Thereafter, the parties signed an addendum to the MOU (addendum) stating that the current CNI — $12,652,548 — exceeded the cap set in the MOU. The addendum raised the CNI cap to $13.2 million and required defendants, beginning in January 2008, to pay interest on the amount of CNI exceeding $12 million. When they signed the addendum, defendants did not know Russo had used the exchange transactions to increase the CNI. They believed the CNI balance had been computed in accordance with the MOU, i.e., that the exchange transactions would not be used to increase the CNI.

In 2012, Russo advised defendants the CNI balance exceeded $13.2 million. She notified defendants they owed interest on the CNI amount exceeding $12 million and asked defendants to contribute capital.[3] Defendants refused; Russo filled the funding gap. By early 2013, ASB I's business operations were largely completed but ASB II's development project was ongoing. Russo attempted to make a capital call to fund ASB II's operations. Several months later, Russo informed defendants that her capital contributions had diluted defendants' member interests in ASB II. She warned defendants that if they did not cure their defaults, they would be removed as managers of ASB II. In August, Russo executed a written consent removing defendants as managers of ASB II. As the ownership dispute between Russo and defendants unfolded, ASB II's development project stalled.

---

[3] Defendants did not learn that Russo had used the exchange transactions to increase CNI until late 2012 or early 2013. In early 2013, Andrews told Russo that defendants "had concerns about the accuracy of the CNI accounting." In response, Russo falsely claimed the CNI issues had been discussed before the parties signed the addendum. She also refused to answer defendants' questions and threatened them with litigation.

In 2014, Russo filed a lawsuit against defendants. Her operative complaint sought declaratory relief that the CNI balance in the addendum was accurate; that defendants had failed to make required capital contributions, which diluted their member interests and diminished their manager voting power in the companies; that defendants had been removed as managers of ASB II; and that Russo was entitled to purchase defendants' member interests in the companies due to their default. Russo also sought a judicial declaration that her family's estate planning transactions had not diminished her membership interest in ASB II and that she retained full manager voting rights in that company.

Defendants cross-complained. They sought declaratory relief that the CNI cap in the MOU had not been reached; that they were not in default and had no obligation to contribute additional capital; that their membership interests had not been diluted and they had not been removed as managers; and that they continued to hold a 50 percent membership interest in ASB II. They also sought a judicial declaration that as a result of the Russo family's estate planning transactions, Russo retained only a "special membership" in ASB II, not a member interest, which meant she had no manager voting power in ASB II and she could not demand capital contributions. Finally, defendants alleged claims for breach of contract, breach of the implied duty of good faith and fair dealing, fraud, breach of fiduciary duty, and accounting. They sought declaratory and injunctive relief, an accounting, and compensatory and punitive damages.

The trial court decided liability and compensatory damages before punitive damages. In the first phase of the bifurcated trial, the court found Russo liable for fraud, breach of fiduciary duty, and breach of contract, and awarded defendants damages and equitable relief. It issued detailed findings

7

resolving the parties' declaratory relief claims. Thereafter, defendants dismissed their punitive damages claims with prejudice. The court entered judgment for defendants on all but two causes of action in Russo's complaint and one cause of action in defendants' cross-complaint. The court deemed defendants prevailing parties on the contract claims and awarded them attorney fees (Civ. Code, § 1717) and a portion of their costs (Code Civ. Proc., § 1033.5; undesignated statutory references are to this code).

## DISCUSSION

## I.

### *Russo's Appeal from the Judgment*

Russo challenges the judgment on several grounds. She contends: (1) the presumption set forth in Evidence Code section 622 estopped defendants from arguing she fraudulently inflated the CNI balance in the addendum; (2) defendants' fraud claim fails for lack of justifiable reliance; (3) she is not liable for breach of contract because defendants did not prove monetary damages; (4) the trial court erred by awarding equitable relief; and (5) the court erred in awarding emotional distress damages.

### A. Statutory Estoppel Does Not Apply

Russo urged the trial court to apply the presumption set forth in Evidence Code section 622 to estop defendants from challenging the accuracy of the CNI balance in the addendum. The court declined to do so. It found Russo — who undisputedly owed a fiduciary duty to defendants — "placed a false statement in the Addendum and used a misleading [ledger] to support [that] misrepresentation." Based on these findings, the court concluded "the fraud exception" barred Russo from invoking the presumption. We review the court's factual findings for substantial evidence. (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613.)

8

Evidence Code section 622 provides that "facts recited in a written instrument are conclusively presumed to be true as between the parties thereto[.]" The statute — which codifies the common law doctrine of estoppel by contract — is based on " 'the principle that parties who have expressed their mutual assent are bound by the contents of the instrument they have signed, and may not thereafter claim that its provisions do not express their intentions or understanding.' " (*In re Marriage of Clarke & Akel* (2018) 19 Cal.App.5th 914, 920–921.)

When one party to a contract alleges fraud, the other party may not rely on the statutory presumption to conclusively prove facts recited in the contract. (*Bruni v. Didion* (2008) 160 Cal.App.4th 1272, 1291 (*Bruni*); *City of Santa Cruz v. Pacific Gas & Electric Co.* (2000) 82 Cal.App.4th 1167, 1177.) Here, defendants alleged — and proved by clear and convincing evidence — that Russo fraudulently misstated the CNI balance in the addendum. Under the circumstances, Evidence Code "section 622 has no application." (*Citizens Business Bank v. Gevorgian*, *supra*, 218 Cal.App.4th at p. 625; *Estate of Wilson* (1976) 64 Cal.App.3d 786, 801–802 [party may avoid presumption with an affirmative showing of fraud].)

Russo insists the fraud exception applies only where a party seeks "complete rescission" of the contract. But the cases she cites do not stand for the proposition that a demand for rescission is a prerequisite to the fraud exception. And — as Russo acknowledges — at least one case suggests otherwise. In *Bruni*, the plaintiffs sought to avoid arbitration by claiming they did not knowingly agree to arbitration provisions in home warranty agreements. (*Bruni*, *supra*, 160 Cal.App.4th at pp. 1276, 1290.) In opposition, the defendants argued the plaintiffs were bound, under Evidence Code section 622, by a written recital that they had " 'read a sample copy of

9

the warranty booklet.' " (*Bruni,* at p. 1291.)  The *Bruni* court declined to apply the statutory presumption.  It held the statute "does not bar an assertion of fraud or other grounds for rescission" and explained that for similar reasons, the statutory presumption "should not apply to recitals in an adhesion contract."  (*Ibid.*)  In *Bruni*, the plaintiffs did not seek to rescind the warranty agreement.  Instead, they sought to prove they were not bound by the arbitration provision, just as defendants here argued they were not bound by the CNI recital in the addendum.  Thus, *Bruni* supports the conclusion we reach here: that the trial court properly refused to apply the Evidence Code section 622 presumption because defendants pled and proved Russo procured the addendum by fraud.

Having reached this result, we need not address the trial court's alternative finding that the addendum was a recital of a consideration to which the statutory presumption did not apply.  (See Evid. Code, § 622.)

## B.    Defendants' Reliance Was Justified

The elements of fraud are:  (1) a misrepresentation, i.e., false representation, concealment, or nondisclosure; (2) knowledge of falsity; (3) intent to defraud; (4) justifiable reliance; and (5) resulting damage.  (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 974.)  Reliance is reasonable if the "matter was material in the sense that a reasonable person would find it important in determining how he . . . would act."  (*Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1194.)  When a fraud claim is based upon a misrepresentation or nondisclosure by a fiduciary, "the reliance element is relaxed" such that a court may "presume reasonable reliance . . . absent direct evidence of a lack of reliance."  (*Estate of Gump* (1991) 1 Cal.App.4th 582, 601.)

10

The trial court found Russo owed a fiduciary duty to defendants, which required her to "account accurately for ASB II transactions—including [the] CNI computations." The court determined Russo breached that fiduciary duty and defrauded defendants by surreptitiously adding the exchange transactions to the CNI total in the informal ledgers, failing to disclose this information to defendants, presenting the addendum to them for signature, and then insisting the CNI properly included the value of the exchange transactions. It also determined Russo knew the CNI increase was improper and that she acted with the intent to deceive defendants, all as part of a plan to "divest [defendants] of control and . . . ownership of ASB II." The evidence of fraud, the court observed, was "clear and convincing."

The trial court also concluded defendants had a right to rely on Russo — and to presume the truthfulness of the information she provided — based on the parties' fiduciary relationship. The court determined defendants' reliance on Russo's misrepresentations was justified because Russo never disclosed the change in CNI methodology, and that defendants began investigating as soon as they first became suspicious the CNI figure was inaccurate in late 2012 or early 2013.

Russo does not dispute the trial court's finding that she owed defendants a fiduciary duty, and she does not challenge the overwhelming evidence that she misrepresented the CNI balance with fraudulent intent. Instead, Russo contends the fraud claim fails because defendants failed to prove justifiable reliance. This is so, according to Russo, because defendants "had an obligation to independently verify the CNI balance" in the monthly ledgers. We are not persuaded. Here, the evidence supports a reasonable inference that defendants relied on Russo to provide accurate information about the CNI balance, and that their reliance was reasonable. (*OCM*

11

*Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007)
157 Cal.App.4th 835, 866–867.)

Stroud testified it was his responsibility to know how much capital Russo had invested "[b]ased on the information . . . Voss provided." Stroud explained he did not independently verify the CNI balance before signing the addendum because he took Voss — and the information he provided — "at his word." Andrews looked at the ledgers "extremely rarely." When he had a question about the CNI balance, he asked Voss. Like Stroud, Andrews "assumed" the CNI balance in the addendum was correct. This assumption was reasonable because neither Russo nor Voss told defendants the exchange transactions had been used to inflate the CNI balance. And the evidence was undisputed that defendants did not discover that Russo had added the exchange transactions to the CNI until late 2012 or early 2013.

Andrews's testimony does not, as Russo suggests, undermine the trial court's justifiable reliance finding. Andrews acknowledged he had a "pretty good" idea of the CNI balance recited in the monthly ledgers. But as demonstrated above, Russo inflated the CNI balance using a sleight of hand. Equally unpersuasive is Russo's contention that nothing prevented defendants from reviewing the monthly ledgers to confirm "the CNI balance was accurately reported" and that had defendants done so, they would have noticed the "glaring" increase in CNI. This argument defies logic and common sense. Reviewing the monthly ledgers would have been an exercise in futility because Russo used a "hidden formula . . . to accomplish the changes" beginning with the May 2006 ledgers.

### C.    Russo is Liable for Breach of Contract

The elements of a breach of contract claim are: (1) a contract; (2) the plaintiff's performance of the contract or excuse for nonperformance; (3) the

defendant's breach; and (4) resulting damage to the plaintiff. (*Richman v. Hartley* (2014) 224 Cal.App.4th 1182, 1186; CACI No. 303.)

Here, the trial court found all elements of breach of contract. It determined Russo repeatedly breached the MOU by failing to contribute all capital needed by ASB II to "move forward with [the] West Sacramento development" and by insisting defendants contribute the remainder of the capital. The court concluded these breaches were a "substantial factor in causing ongoing delay" of ASB II's development activity and impliedly concluded the delay harmed defendants. Finally, the court determined Russo was "liable for damages for breach of contract" but that such damages were difficult to ascertain. Thus, the court awarded defendants equitable relief to compensate them for the harm caused by Russo.[4]

Russo asserts the breach of contract claim fails because an equitable adjustment "is not damages" and damages are an essential element of breach of contract. This argument — which conflates the concepts of harm and damages — is not persuasive. Injury, or "resulting harm," is an element of a breach of contract cause of action. (*Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 795.) Monetary damages are a remedy, a means of compensating a party for injury or harm caused by a contractual breach. (Civ. Code, §§ 3281, 3300; *Brandon & Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 455 ["basic object of damages is compensation"].)

But as Russo concedes, monetary damages are not the *only* remedy for breach of contract: equitable remedies are also available. (*Real Estate*

---

[4] The judgment provides in relevant part: "No remedies are awarded for breach of contract (other than declaratory relief) because [defendants] have elected to receive fraud damages and equitable adjustments rather than breach of contract remedies."

13

*Analytics, LLC v. Vallas* (2008) 160 Cal.App.4th 463, 472–473 [specific performance]; *Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1167 [injunctive relief available where " 'pecuniary compensation would not afford adequate relief' " or where " 'it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief' "].)

Here, the trial court found Russo "liable for damages for breach of contract" but concluded monetary damages were difficult to ascertain given the nature of the parties' business dealings. Russo "cannot escape liability for [her] breach merely because [defendants'] damages cannot be measured exactly." (*SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 571.) As a result — and as discussed in more detail below — the court awarded defendants equitable relief to compensate them for the harm Russo caused. The court's failure to award money damages is not fatal to defendants' breach of contract claim, and the authority cited by Russo does not demonstrate otherwise.

### D. No Abuse of Discretion in Awarding Equitable Relief

Next, Russo challenges the equitable adjustment. To place her arguments in context, we summarize the equitable adjustment and the principles governing equitable relief.

Pursuant to its operating agreement, ASB II distributes profits in phases. First Russo receives a preferred return, the amount of invested capital plus interest. Then defendants receive a distribution, which includes interest. Next, a monetary sum is distributed according to the parties' ownership percentages (50 percent for Russo and 50 percent for defendants). Fourth, defendants receive a distribution in an amount equal to the interest

14

paid to Russo under the preferred return. Fifth, any remainder is distributed according to ownership percentages.

Defendants alleged Russo's refusal to contribute capital and her insistence that defendants were no longer managers of ASB II caused management gridlock that delayed ASB II's development project. They sought damages of $3.8 million for each year of delay, comprised of the amount of interest that accrued annually to Russo on her invested capital, plus the holding costs for ASB II's real property. Later, however, defendants acknowledged that under certain distribution scenarios, monetary damages might "compensate them for a loss they will never suffer." For example, if ASB II produced a modest return, Russo may not receive interest on invested capital and, as a result, there would be no loss to defendants "from the mounting preferred return during the period of delay." Or, if ASB II generated sufficient revenue to make the interest payment to defendants in phase four of the distribution, defendants would also suffer no injury.

Under the circumstances, defendants requested equitable relief. They urged the trial court to deny Russo a preferred return under the ASB II operating agreement from January 1, 2013 to the conclusion of the legal proceedings. This approach, defendants asserted, would fairly compensate them without creating a "risk of double recovery." The court granted an "equitable adjustment" and denied Russo a "preferred return under [the ASB II] operating agreement for the period of delay from January 1, 2013 to the conclusion of the legal proceedings." In essence, the adjustment prevented Russo from accruing interest on her capital investment during a specified time period.

"A trial court sitting in equity has broad discretion to fashion relief. [Citations.] An equitable decree is reviewed under the abuse of discretion

15

standard, under which 'we resolve all evidentiary conflicts in favor of the judgment and determine whether the court's decision " 'falls within the permissible range of options set by the legal criteria.' " ' [Citations.] [¶] But a trial court's discretion is always delimited by the applicable legal standards." (*Estates of Collins & Flowers* (2012) 205 Cal.App.4th 1238, 1246–1247.) There is "no right to equitable relief . . . when there is an adequate legal remedy." (13 Witkin, Summary of Cal. Law (11th ed. 2021) Equity, § 3, p. 278; *Andal v. City of Stockton* (2006) 137 Cal.App.4th 86, 91.) "Conversely, the absence of an adequate remedy at law is a reason for the exercise of equity jurisdiction. [Citation.] Thus, equitable relief is flexible and expanding, and the theory that 'for every wrong there is a remedy' [citations] may be invoked by equity courts to justify the invention of new methods of relief for new types of wrongs." (13 Witkin, *supra*, at § 3, p. 279.)

Russo argues equitable relief was unwarranted because the trial court concluded defendants "were not legally entitled to relief" for the delay. But that is not what the court found. Properly understood, the court determined defendants were harmed by Russo's repeated contractual breaches — which delayed the ASB II development project — but found the monetary damages could not, at the time of trial, be quantified. Accordingly, equitable relief was justified. (Cf. *DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 726; *Syngenta Crop Protection, Inc. v. Helliker*, *supra*, 138 Cal.App.4th at p. 1167.)

The equitable adjustment was a proper exercise of the trial court's discretion. It is well settled that equity " 'will assert itself in those situations where right and justice would be defeated but for its intervention.' [Citation.] . . . '[E]quity has contrived its remedies "so that they shall correspond both to the primary right of the injured party, and to the wrong by

16

which that right has been violated," and "has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case[.]" ' " (*Bisno v. Sax* (1959) 175 Cal.App.2d 714, 728–729.)  Here, the court reasonably exercised its discretion to fashion a remedy for Russo's conduct and the detrimental effect it had on ASB II's ability to develop the land and sell the lots to homebuilders.

Russo's reliance on *Johnson v. Tago, Inc.* (1986) 188 Cal.App.3d 507 does not alter our conclusion.  There, the lower court — acting under the guise of its equitable powers — issued a preliminary injunction ordering the defendant to pay a portion of the plaintiffs' attorney fees.  (*Id.* at p. 517.)  The appellate court reversed, holding there was "no legal basis" for the award in the absence of a statute or contract authorizing attorney fees and that a "court of equity cannot grant relief which the law denies." (*Id.* at pp. 517, 518.)  *Johnson* is distinguishable as the trial court did not grant relief prohibited by law.

Russo also insists the equitable adjustment impermissibly "modifies" the ASB II operating agreement.  We disagree.  Interpreted logically, the judgment precludes Russo from accruing interest on her capital contributions for a specified period.  The judgment does not reform or rewrite the ASB II operating agreement.  Instead, the judgment takes a known economic measure — the amount of interest — and uses it to fashion a remedy for the delay caused by Russo.

Next, Russo complains about the duration of the equitable adjustment, which precludes her from accruing interest on her capital contributions from January 2013 to "the conclusion of these legal proceedings."  Russo asserts the equitable adjustment should have ended on "the last day of trial, which

17

was June 23, 2016." According to Russo, this date is appropriate because there is no evidence that posttrial or appellate proceedings would preclude ASB II from completing its development project. We reject this argument. Reviewing — as we must — the record in the light most favorable to the judgment, we conclude ample evidence supports a reasonable inference the ASB II management gridlock would continue during the pendency of the litigation, including appellate proceedings. At trial, defendants offered evidence that the dispute over capital contributions, managerial control, and voting rights disrupted ASB II's business operations and brought ASB II development activity "to a halt." This evidence supports a reasonable inference that these issues would persist pending final resolution by an appellate court.

Finally, Russo asserts the equitable adjustment must be reversed because defendants did not prove "development delay" with expert testimony. To the extent this argument is properly before us, we reject it on the merits.[5] When a "matter in issue is one within the knowledge of experts *only* and not within the common knowledge of laymen, it is necessary for the plaintiff to introduce expert opinion evidence in order to establish a prima facie case." (*Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 702.) Here, the development delay was not an issue within the knowledge of experts *only*. It does not require an expert to show that Russo's refusal to contribute capital needed for ASB II to move forward with the development — together with her attempt to wrest control of the company

_____

[5] Russo did not raise this argument at trial. Had she done so defendants could have remedied the supposed error before judgment was entered. (See *In re Riva M.* (1991) 235 Cal.App.3d 403, 411–412 [party's failure to object to absence of expert testimony in trial court waived argument on appeal].)

18

from defendants — delayed the ASB II development project.  Rather, this issue was " ' "resolvable by common knowledge" ' " and supported by the testimony of defendants, experienced real estate development professionals with personal knowledge of the circumstances surrounding the delay. (*Easton v. Strassburger* (1984) 152 Cal.App.3d 90, 106.)  Thus, the trial "court did not err by failing to require 'expert testimony' on the issue of [development delay]."  (*Id.* at p. 107.)

### E.  The Award of Emotional Distress Damages is Proper

The trial court awarded emotional distress damages to compensate defendants for Russo's "fraudulent acts and breaches of fiduciary duty," finding that her "effort to divest" defendants "of control and, for the most part, ownership of ASB II . . . had emotional impacts."

According to Russo, defendants waived damages for emotional distress by stating their damages were "economic in nature" in response to Judicial Council form interrogatory No. 9.1.  This argument fails because the form interrogatories propounded by Russo are not part of the record.  Without them, Russo cannot establish defendants' responses to form interrogatory No. 9.1 constitute a binding admission on the issue of emotional distress damages.  (*In re Marriage of Deal* (2020) 45 Cal.App.5th 613, 622.)  In a footnote in her reply brief, Russo urges us to take judicial notice of the form interrogatories.  We decline this belated and procedurally deficient request. (*Kao v. Joy Holiday* (2020) 58 Cal.App.5th 199, 204, fn. 3.)

Russo also insists defendants cannot recover emotional distress damages in the absence of an accompanying award of "substantial damages." This argument — which is premised on a misreading of *Crisci v. Security Ins. Co.* (1967) 66 Cal.2d 425 (*Crisci*) — is not persuasive.  In *Crisci*, our high court considered the propriety of emotional distress damages awarded in an

insured's action against an insurer for failing to accept a settlement offer within policy limits. (*Id.* at pp. 428–429.) *Crisci* began by noting the claim sounded in tort, and that the "general rule of damages in tort is that the injured party may recover for all detriment caused whether it could have been anticipated or not." (*Id.* at pp. 432, 433.)

*Crisci* continued: "In accordance with the general rule, it is settled in this state that mental suffering constitutes an aggravation of damages when it naturally ensues from the act complained of. . . . The commonest example of the award of damages for mental suffering in addition to other damages is probably where the plaintiff suffers personal injuries in addition to mental distress as a result of either negligent or intentional misconduct by the defendant. [Citations.] Such awards are not confined to cases where the mental suffering award was in addition to an award for personal injuries; damages for mental distress have also been awarded in cases where the tortious conduct was an interference with property rights without any personal injuries apart from the mental distress." (*Crisci, supra*, 66 Cal.2d at p. 433.)

*Crisci* held that a "plaintiff who as a result of a defendant's tortious conduct loses his property and suffers mental distress may recover not only for the pecuniary loss but also for his mental distress. No substantial reason exists to distinguish the cases which have permitted recovery for mental distress in actions for invasion of property rights. The principal reason for limiting recovery of damages for mental distress is that to permit recovery of such damages would open the door to fictitious claims, to recovery for mere bad manners, and to litigation in the field of trivialities. [Citation.] Obviously, where, as here, the claim is actionable and has resulted in substantial damages apart from those due to mental distress, the danger of

20

fictitious claims is reduced, and we are not here concerned with mere bad manners or trivialities but tortious conduct resulting in substantial invasions of clearly protected interests." (*Crisci, supra*, 66 Cal.2d at pp. 433–434.)

According to Russo, *Crisci* stands for the proposition that emotional distress damages are recoverable on a fraud claim only when accompanied by "substantial damages." Not so. In articulating the substantial damage standard, *Crisci* "was attempting to resolve the fundamental jurisprudential conflict engendered by the 'impact or injury' rule. To ascertain the genuineness of a claim the court decided to look to the facts of the case to determine whether plaintiff had suffered an empirically verifiable injury: a detriment whose impact was readily observable and identifiable; an injury which could not be as easily fabricated as mental distress, since proof of it could, and should, be drawn from sources other than the plaintiff's own mouth. Thus, if a complaint indicates (for example) *that a plaintiff was deprived of the use of his real property or his financial resources*; or suffered physical injury . . . , he may reasonably have been said to have suffered substantial damages. Sufferance of injuries such as these permit the reasonable inference that plaintiff's claim of mental distress is genuine." (*Jarchow v. Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917, 936–937 (*Jarchow*), italics added, superseded by statute on another point as stated in *Southland Title Corp. v. Superior Court* (1991) 231 Cal.App.3d 530, 536.)

Under *Crisci*, "*substantial damage* need not be compensable (since imposition of a requirement of compensability would add little to the guarantee of genuineness); interference with one's legally protected interests is sufficient damage to satisfy the test set forth in *Crisci*, and to guard against potentially fraudulent emotional distress claims." (*Jarchow, supra*, 48 Cal.App.3d at p. 937; *Molien v. Kaiser Foundation Hospitals* (1980)

21

27 Cal.3d 916, 926–927 [compensation for infliction of emotional distress may be recovered "provided there is some assurance of the validity of the claim" and citing *Crisci* and *Jarchow* with approval].)

Applying *Crisci*'s rationale here compels a conclusion that the award of emotional distress damages was proper. Russo attempted to dilute defendants' ownership interest in the companies and to oust defendants from their management roles. In doing so, Russo breached her fiduciary duty to defendants and interfered with their property interest in the companies. This injury to defendants' property rights supports a reasonable inference that that their claim of emotional distress is genuine. Thus, defendants were entitled to damages for emotional distress. (*Jarchow*, *supra*, 48 Cal.App.3d at p. 936.)

Russo's reliance on *Nagy v. Nagy* (1989) 210 Cal.App.3d 1262 is unavailing. There, the plaintiff sued his ex-wife for fraud after discovering a son born during their marriage was not his biological child. (*Id.* at p. 1267.) *Nagy* held the complaint's "failure to plead damages" was fatal to the fraud claim. (*Id.* at p. 1269.) In reaching this conclusion, *Nagy* noted the law did not permit "a person to recover damages for developing an intimate relationship with a child and performing all the acts of a parent." (*Ibid*.) The *Nagy* court observed that "damages for emotional distress can be recovered in a fraud cause of action," but "only as an aggravation of other damages." Because the plaintiff had not pled "any legally recognizable damages" — and indeed, was not injured — *Nagy* opined "damages for emotional distress alone [were] not recoverable." (*Ibid*.)

*Nagy* is distinguishable. Here, defendants pled and proved injury from Russo's fraudulent conduct, and they recovered equitable relief. We have no quarrel with the proposition that emotional distress damages may be

22

unavailable in a fraud cause of action in the absence of injury. But *Nagy* does not stand for the proposition that failure to award substantial monetary damages precludes an award of emotional distress damages when, as here, a party has alleged and proved interference with its legally protected property interests. "It is axiomatic that cases are not authority for propositions that are not considered." (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1043.)

II.

*Defendants' Cross-appeal from the Judgment*

Defendants challenge the trial court's findings on their estate planning claims.

### A. Unsuccessful Attempts to Transfer ASB II Member Interests to GRATs

As Yarbrough's health declined, Russo became more involved in the companies, eventually taking over Yarbrough's role as member and manager. Under the ASB II operating agreement, the parties held voting rights according to their membership or ownership percentages: 50 percent for Russo, and a combined 50 percent for defendants. Company action required majority approval.

Yarbrough's family also began "estate planning in earnest." The family formed the Yarbrough Family Trust (trust) and transferred Russo's ASB II membership interest into the trust. In 2006, Russo wanted to place her ASB II membership interest in a grantor retained annuity trust (GRAT). A GRAT allows the grantor to place an asset into a trust for a defined period, with any appreciation in value passing tax-free to the beneficiary.

But an individual — not a trust — must create a GRAT, so Russo transferred 45 percent of the ASB II membership interest out of the trust and back to Yarbrough and his wife, Louise, in equal shares. Five percent of the

23

ASB II interest remained in the trust. Then Yarbrough and Louise transferred their respective membership interests to GRATs created in their names. Written assignments provided the membership interests being transferred to the GRATs were "undivided." The written assignments omitted any reference to voting rights.

The fourth amendment to the ASB II operating agreement authorized Yarbrough and Louise to transfer the ASB II membership interests to the GRATs. The amendment stated the GRATs were "Special Members" of ASB II and defined a "Special Member" as a "member" of the company with limited voting rights. By transferring the ASB II membership interests to the GRATs, neither Louise nor Russo intended to forfeit voting rights. Andrews understood "the transfers to the GRATs would have no impact on [Russo's] voting rights as a member of ASB II" or on Russo's "voting rights as a manager in ASB II."

Ultimately, the GRATs failed.[6] Upon termination of the GRATs, the 45 percent membership interest in ASB II reverted to Russo; the trust held the remaining 5 percent. In 2008, Louise tried — for a second time — to create a GRAT. She placed 45 percent of her ASB II membership interest in a GRAT, but the membership interest did not increase in value and the GRAT failed.

Thus, in 2010 Russo owned a 45 percent membership interest in ASB II. The trust held the other 5 percent. Later, Russo transferred her interest

---

[6] The family used "zeroed-out GRATs." This mechanism requires the trust, by the end of the defined term, to return to the grantor 100 percent of the value placed into the trust, plus a specified percentage increase to account for an assumed rate of return. A zeroed-out GRAT fails if (1) the asset placed in the trust does not appreciate enough in value to pay back the grantor and generate increased value that can be passed tax-free to the heirs, or (2) the grantor dies during the trust term.

in ASB II to B&L Properties, II, LLC, a company owned by Russo and her siblings. In a letter agreement signed after the second GRAT failed, defendants acknowledged Russo "would remain a Manager" of ASB II and, in her capacity as president of B&L Properties, II, LLC she "would be voting its membership interests in" ASB II.

In the trial court, defendants claimed Russo lost her voting rights in ASB II by placing her "undivided" ASB II membership interest in the GRATs, which were nonvoting "Special Members" under the fourth amendment to the ASB II operating agreement. The court rejected this argument. It determined Russo transferred her economic interests in ASB II — not her voting rights in that company — to the GRATs. In reaching this conclusion, the court relied on Russo and Louise's testimony disclaiming an intention to transfer voting rights, and on the testimony of Russo's expert witness, who testified written assignments are often prepared for tax compliance purposes and, as a result, typically "do not speak to the transfer of LLC membership voting rights." In the alternative, the court determined that even if the voting rights were transferred to the GRATs, those rights returned to Russo when the GRATs failed.

"Evidence of the circumstances surrounding the execution of the trust instrument is properly admissible to ascertain its meaning and intent." (*Burch v. George* (1994) 7 Cal.4th 246, 258, fn. 8, superseded by statute on other grounds as stated in *Estate of Rossi* (2006) 138 Cal.App.4th 1325, 1339.) Extrinsic evidence is also generally admissible to resolve ambiguities, and correct errors, in donative instruments. (*Estate of Duke* (2015) 61 Cal.4th 871, 887; *Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 73–74.) "The interpretation of a will or trust instrument presents a question of law unless interpretation turns on the credibility of extrinsic evidence or a conflict

25

therein." (*Burch*, at p. 254; see *Estate of Dodge* (1971) 6 Cal.3d 311, 318.) Here, extrinsic evidence was admissible to ascertain whether the written assignments transferred voting rights in ASB II and " 'to show the existence of an ambiguity and to help construe' " them. (*Burch*, at p. 258, fn. 8.)

The written assignments transferred an "undivided" ASB II membership interest to the GRATs. But Louise and Russo testified they did not intend to relinquish voting rights by transferring the ASB II membership interests to the GRATs. Russo's expert testified similarly. Andrews understood "the transfers to the GRATs would have no impact on [Russo's] voting rights" as a member or manager of ASB II. And after the GRATs failed, defendants acknowledged Russo "would remain a Manager" of ASB II and that, as president of B&L Properties II, LLC, she "would be voting its membership interests in" ASB II. Together, this evidence amply supports the trial court's determination that Russo did not transfer ASB II voting rights into the GRATs or, even assuming she did, those voting rights reverted to Russo when the GRATs failed. Defendants' argument to the contrary — premised on a one-sided rehash of the evidence in their favor and unsupported by persuasive authority — is unavailing.

In sum, the trial court did not err by concluding Russo did not transfer member voting rights to the GRATs and, in the alternative, that those rights reverted to Russo upon the failure of the GRATs.

## B.     Transfer of a Special Member Interest to Voss

In 2006, Russo gave the family's longtime controller, Voss, a special member interest in ASB II. The third amendment to the ASB II operating agreement admitted Voss as a special member and gave him a "special allocation," meaning he would receive a small percentage of profits from specific sales. Voss received the allocation from Russo's final profit

allocation.  This arrangement allowed Voss to treat certain proceeds he received from his work with ASB II as capital gains rather than ordinary income.  As a special member, Voss had no "ability to vote on the management of the company" or "to make management decisions."  The fourth amendment to the ASB II operating agreement also provided that "[f]or all purposes relating to the management of the Company, 'Company Interests' will be computed without reference to the interests of the Special Members or the transfer of interests in the Company to them by Members."

In the trial court, defendants argued the creation of the special member interest for Voss meant Russo "had less than a 50% Manager voting interest" in ASB II.  This was so, according to defendants, because manager voting rights followed profit distributions, and by giving Voss "a 1.5% participation in a final distribution," Russo's voting rights dipped below 50 percent.  The court disagreed.  It concluded the plain language of the fourth amendment to the ASB II operating agreement provided special members have no voting rights and that voting rights are determined by managers' rights to share in the profits and losses of ASB II.  The court determined Voss's special membership was "irrelevant for determining Manager voting rights."

We decline to disturb this reasonable and commonsense interpretation of the fourth amendment to the ASB II operating agreement.  Defendants offer an alternative interpretation, but they do not explain how it comports with well-established principles of contractual interpretation.  Nor do they offer any legal analysis or authority — other than a single citation regarding the standard of review.  "When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary."  (*Landry v. Berryessa Union School Dist.*

(1995) 39 Cal.App.4th 691, 699–700.)  We conclude the trial court did not err by concluding Voss's special member interest in ASB II did not reduce Russo's manager voting rights.

III.

*Appeals from the Award of Prevailing Party*
*Attorney Fees and Costs*

Both parties challenge the orders awarding defendants attorney fees and costs.  Russo argues the trial court erred by determining defendants were prevailing parties under Civil Code section 1717.  Defendants contend the court erred by declining to award electronic discovery costs under section 1033.5, subdivision (c).

### A.     No Abuse of Discretion in Deeming Defendants the Prevailing Parties on the Contract Claims

The companies' operating agreements authorized an award of reasonable attorney fees to the prevailing party in an action brought to enforce or interpret the agreements.  After the trial court entered judgment in their favor on all but three claims asserted in the lawsuit, defendants argued they were prevailing parties under Civil Code section 1717 because they "achieved a complete victory by winning every claim" under the ASB I operating agreement and they "achieved their major litigation objectives" under the ASB II operating agreement.  In opposition, Russo asserted there was no prevailing party because the adjudication of defendants' contract claims was a "split decision."  The court agreed with defendants.  It determined they "prevailed on most of their claims and defenses . . . in the contractual claims, and the work done on these claims was inextricably intertwined with the work done on the other claims."  (Capitalization omitted.)  It awarded defendants $2,150,000 in attorney fees.

28

Russo challenges the trial court's prevailing party determination. In an action on a contract, Civil Code section 1717 "permits an award of attorney's fees to the prevailing party. '[T]he party prevailing on the contract shall be the party who recovered *a greater relief in the action on the contract*. The court may also determine that there is no party prevailing on the contract for purposes of this section.' " (*Silver Creek, LLC v. BlackRock Realty Advisors, Inc.* (2009) 173 Cal.App.4th 1533, 1538 (*Silver Creek*); *Hsu v. Abbara* (1995) 9 Cal.4th 863, 865.)

"When a party obtains a ' "simple, unqualified win" ' by completely prevailing on, or defeating, the contract claims in the action and the contract contains a provision for attorney's fees, the successful party is entitled to attorney's fees as a matter of right, eliminating the trial court's discretion to deny fees under section [Civil Code] 1717. [Citation.] 'If neither party achieves a complete victory on all the contract claims, it is within the discretion of the trial court to determine which party prevailed on the contract or whether, on balance, neither party prevailed sufficiently to justify an award of attorney fees.' [Citation.] 'Because the statute allows such discretion, it must be presumed the trial court has also been empowered to identify the party obtaining "*a greater relief*" by examining the results of the action in relative terms: the general term "greater" includes "[l]arger in size than others of the same kind" as well as "principal" and "[s]uperior in quality." ' " (*Silver Creek, supra*, 173 Cal.App.4th at p. 1538.)

When making a prevailing party determination under Civil Code section 1717, the trial court compares " 'the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources.' [Citation.] Additionally, 'in determining

29

litigation success, courts should respect substance rather than form, and to this extent should be guided by "equitable considerations." For example, a party who is denied direct relief on a claim may nonetheless be found to be a prevailing party if it is clear that the party has otherwise achieved its main litigation objective.' " (*Silver Creek*, *supra*, 173 Cal.App.4th at p. 1539; *Hsu v. Abarra*, *supra*, 9 Cal.4th at p. 876.) "A trial court has wide discretion in determining which party is the prevailing party under [Civil Code] section 1717, and we will not disturb [that] determination absent 'a manifest abuse of discretion, a prejudicial error of law, or necessary findings not supported by substantial evidence.' " (*Silver Creek*, at p. 1539.)

Russo maintains de novo review is appropriate because the trial court applied the "wrong legal standard." Not so. The parties urged the court to apply the correct legal standard when making the prevailing party determination, and there is no indication the court deviated from that standard. (*Silver Creek*, *supra*, 173 Cal.App.4th at pp. 1538–1539.) Thus, we review the court's prevailing party determination for abuse of discretion.

Here, the capital contribution, ownership dilution, and managerial ouster issues were the focus of litigation. And the CNI issue was the linchpin. For example, in their cross-complaint, defendants urged the trial court to declare that: (1) the CNI cap in the MOU had not been reached; (2) Russo overstated the CNI balance in the addendum; and (3) because the CNI cap had not been reached, defendants were not in default and had no obligation to contribute additional capital, and their membership interests had not been diluted and they had not been removed as managers. Defendants also alleged Russo breached the MOU by using the exchange transactions to overstate the CNI balance and by demanding they contribute capital needed for the ASB II development.

The trial court found in favor of defendants on all these issues. It devoted a significant portion of its statement of decision to determining the MOU unambiguously provided exchange transactions would not be used to increase the CNI. The court's other findings flowed from that dispositive determination: it found that because the CNI did not include the exchange transactions, Russo had misstated the CNI balance in the addendum; defendants were not required to contribute capital; they were not in default; and that their membership interests had not been diluted and they remained managers of both companies. The court also found Russo repeatedly breached the MOU and awarded defendants equitable and declaratory relief. It entered judgment in defendants' favor on all but one of the contract claims asserted in the cross-complaint. As the record supports a reasonable inference defendants achieved both their "main litigation objective" and the "greater relief on the contract in this mixed result case" (*Silver Creek*, *supra*, 173 Cal.App.4th at pp. 1536, 1540), the court acted within its discretion in concluding defendants were prevailing parties within the meaning of Civil Code section 1717. (*Silver Creek*, at p. 1540; *Ritter & Ritter, Inc. Pension & Profit Plan v. The Churchill Condominium Assn.* (2008) 166 Cal.App.4th 103, 126.)

Russo's arguments to the contrary are not persuasive. For example, Russo points to defendants' lack of success on their estate planning claims as an indication that defendants were not prevailing parties. But the trial court was within its discretion to conclude Russo's success on those claims was comparatively small, both in terms of the number of the claims and their importance in the context of the litigation as a whole. Next, Russo notes defendants did not recover all of the damages they requested. That circumstance, by itself, does not undermine the court's prevailing party

31

determination. (*Scott Co. of California v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1109 [no abuse of discretion in concluding plaintiff was prevailing party notwithstanding the fact that plaintiff recovered only a fraction of requested damages].) As Russo acknowledges, " 'greater relief' obtained by a party does not necessarily mean greater monetary relief." (*Poseidon Development, Inc. v. Woodland Lane Estates, LLC* (2007) 152 Cal.App.4th 1106, 1120.)

The cases upon which Russo relies, including *Marina Pacifica Homeowners Association v. Southern California Financial Corporation* (2018) 20 Cal.App.5th 191, do not compel reversal. In each of these cases, the appellate court upheld the trial court's exercise of discretion regarding the prevailing party determination. Here too.

## B. Declining to Award Electronic Discovery Costs Was an Abuse of Discretion

Defendants moved for prevailing party costs under section 1033.5. As relevant here, they sought to recover $205,480.77 in electronic discovery costs, that is, costs incurred to maintain an electronic document management database for documents produced during discovery. Defendants urged the trial court to exercise its discretion to award these costs, which they described as "necessary" in this high-stakes and complicated case. According to defendants, it would have been exceedingly difficult — and incredibly costly — to litigate the case without the assistance of an electronic document management platform.

In supporting declarations, counsel for defendants averred the parties' business dealings spanned more than a decade and involved hundreds of transactions and nearly 100,000 documents. Defendants incurred the electronic discovery costs to respond to the voluminous and far-reaching document requests propounded by Russo. The electronic database — which offered imaging and searching tools — allowed defendants to locate

32

responsive documents and exclude confidential or privileged information from document production. Without the database, defendants would have had to manually review 100,000 documents, a cost-prohibitive and inefficient process. As defense counsel explained, there was simply no better, cheaper, or more reasonable way to manage the documents. Counsel averred the costs incurred "were absolutely necessary to the litigation, and . . . reasonable in amount."

Russo moved to tax these costs. She argued the trial court lacked discretion to award electronic discovery costs under *Science Applications Internat. Corp. v. Superior Court* (1995) 39 Cal.App.4th 1095 (*Science Applications*). According to Russo, *Science Applications* held similar charges were not compensable under section 1033.5. And the court, Russo argued, was bound by *Science Applications*.

The trial court granted Russo's motion to tax the electronic discovery costs. Its minute order stated defendants had not shown the costs were "reasonably necessary to conduct the litigation, as opposed to being merely convenient" and stated the electronic discovery costs incurred by defendants were similar to costs "disallowed" in *Science Applications*, *supra*, 39 Cal.App.4th 1095. Finally, the court observed the Legislature had amended section 1033.5, subdivision (a) to allow court-ordered costs for electronic data storage and that "had the Legislature intended to allow electronic data storage costs that were not ordered by the court," it could have done so. According to the court, this statutory omission tended to suggest non-court-ordered electronic discovery costs were not recoverable.[7]

_____

[7] At a hearing on the motion to tax, the trial court stated its ruling was "without prejudice to this expense being requested as an element of the attorney's fees request." Later, defendants sought recovery of electronic discovery costs as an element of attorney fees. Russo did not oppose

33

Defendants contend the trial court erred by refusing to award electronic discovery costs. We agree.

A "prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (§ 1032, subd. (b).) Section 1033.5 specifies "items that qualify as recoverable 'costs' and identifies those that do not." (*Science Applications*, *supra*, 39 Cal.App.4th at p. 1102.) Section 1033.5, subdivision (a) lists allowable costs. These include, among other things, filing fees and attorney fees when authorized by contract or law. (§ 1033.5, subd. (a)(1) & (10).) At the time of the trial court's ruling, allowable costs also included fees for hosting electronic documents if a court orders a party to have documents hosted by an electronic filing service provider. (See § 1033, subd. (a)(15).) Section 1033.5, subdivision (b) lists costs that are not allowable. Among these are investigation expenses in preparing for trial and photocopying expenses other than for exhibits. (*Id.*, subd. (b)(2) & (3).)

"Expenses which do not fit into either of these two categories . . . may be recovered but only at the discretion of the court." (*Science Applications*, *supra*, 39 Cal.App.4th at p. 1103; § 1033.5, subd. (c)(4).) "Allowable costs must be 'reasonably necessary to the conduct of the litigation' and 'reasonable in amount.' " (*Doe v. Los Angeles County Dept. of Children & Family Services* (2019) 37 Cal.App.5th 675, 693; § 1033.5, subd. (c)(2)–(3).) Costs that are "merely convenient or beneficial to [the] preparation" of the conduct of the litigation are not recoverable. (§ 1033.5, subd. (c)(2).) " 'If the items appearing in a cost bill appear to be proper charges, the burden is on the party seeking to tax costs to show that they were not reasonable or necessary.

_____

defendants' right to recover these costs as an element of attorney fees. But when ruling on the motion, the court declined to award attorney fees for electronic discovery on the basis that those charges "were already adjudicated in the motion to tax costs."

34

On the other hand, if the items are properly objected to, they are put in issue and the burden of proof is on the party claiming them as costs.' " (*Lowry v. Port San Luis Harbor District* (2020) 56 Cal.App.5th 211, 222.)

"Whether a cost item was reasonably necessary to the litigation presents a question of fact for the trial court and its decision is reviewed for an abuse of discretion. [Citation.] 'The trial court's exercise of discretion in granting or denying a motion to tax costs will not be disturbed if substantial evidence supports its decision.' " (*Doe v. Los Angeles County Dept. of Children & Family Services, supra*, 37 Cal.App.5th at p. 693.) But an abuse of discretion may be shown when the trial court acted on a mistaken view about the scope of its discretion. (*Olsen v. Harbison* (2005) 134 Cal.App.4th 278, 285.) If the record demonstrates the trial court was unaware of its discretion or misunderstood the scope of its discretion, reversal may be appropriate. (*Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 968.)

Non-court-ordered electronic document hosting charges are neither specifically allowed nor prohibited under section 1033.5. Thus, these costs are recoverable in the trial court's discretion. (*Hooked Media Group, Inc. v. Apple Inc.* (2020) 55 Cal.App.5th 323, 354 (conc. opn. of Mihara, J.); § 1033.5, subd. (c)(4).) Here, the record demonstrates the court did not appear to understand the extent of its discretion to award electronic discovery costs. In denying defendants' request for these costs, the court relied on *Science Applications, supra*, 39 Cal.App.4th 1095. There, the prevailing party paid a vendor $200,000 "to 'Bates-stamp' documents, input them for retrieval, maintain a document library," and create a searchable database for use during discovery and trial. (*Id.* at p. 1104.) The *Science Applications* court held these expenses were akin to hiring "a 'high tech' paralegal" to compile documents and create a searchable database, and that such labor costs were

"not recoverable" because attorney fees were not recoverable.  (*Ibid.*)  The court also expressed concern the prevailing party had unwisely spent millions of dollars on high-tech litigation methods that resulted in recovery of a comparatively smaller award of damages.  (*Id.* at p. 1105.)  *Science Applications* observed: "If a party litigant chooses unwisely to expend monies in trial presentation in excess of the value of the case, utilizing advanced methods of information storage, retrieval and display, when more conventional if less impressive methods are available, the party must stand his own costs."  (*Ibid.*)

*Science Applications* is distinguishable.  Here, recovery of attorney fees is permitted pursuant to the companies' operating agreements.  Moreover, the concern expressed in *Science Applications* regarding the unwise expenditure of funds on high-tech litigation methods (where there were less expensive, low-tech methods of accomplishing the task) is not present here. In the 20 years since *Science Applications* was decided, use of technology in the courtroom has become more common *and* less expensive.  (See *Bender v. County of Los Angeles* (2013) 217 Cal.App.4th 968, 991.)  And here, it was undisputed that using an electronic document platform to manage discovery was more "efficient than any low-tech method of doing the same thing." (*El Dorado Meat Co. v. Yosemite Meat & Locker Service, Inc.* (2007) 150 Cal.App.4th 612, 620; *American Airlines, Inc. v. Shepphard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017, 1057 [" 'high-tech' " methods of displaying documents to the jury were "effective, efficient, and commensurate with the nature of the case"].)

Notwithstanding the stark differences between the two cases, the trial court appeared persuaded by Russo's argument that under *Science Applications*, electronic discovery costs were nonrecoverable and the court

36

had no discretion to award them. Additionally, the court referenced the Legislature's amendment to section 1033.5, subdivision (a), which then allowed recovery for court-ordered costs associated with electronic data storage. The court seemed to suggest non-court-ordered electronic discovery costs were not recoverable. Because *Science Applications* does not preclude the award of electronic discovery costs, and because the absence of a cost item from section 1033.5, subdivision (a) does not prohibit a trial court from awarding those costs, the court's denial of electronic discovery costs appears premised on a mistaken understanding of the scope of its discretion. Thus, reversal is appropriate. (*Noel v. Thrifty Payless, Inc.*, *supra*, 7 Cal.5th at p. 968.)

Reversal is appropriate even if we assume for the sake of argument the trial court exercised informed discretion to disallow defendants' request for electronic discovery costs. In its minute order, the court stated defendants had not established the costs were "reasonably necessary to conduct the litigation, as opposed to being merely convenient." This conclusion lacks evidentiary support as defense counsel offered a detailed — and undisputed — declaration explaining why using an electronic discovery vendor to maintain an electronic document management database was not only indispensable, but also the only cost-effective method of complying with defendants' discovery obligations. Because the court's assumed exercise of discretion is not supported by any evidence, we must reverse. (See *Doe v. Los Angeles County Dept. of Children & Family Services*, *supra*, 37 Cal.App.5th at p. 693.)

We remand for the trial court to exercise its discretion whether to award defendants electronic discovery costs under section 1033.5, subdivision (c)(4); we express no opinion on whether such costs should be awarded, nor

whether the requested amount was reasonable.  Having reached this conclusion, we need not address defendants' contention that the court should have awarded electronic discovery costs as attorney fees.

## DISPOSITION

The judgment and the attorney fee order are affirmed.  The portion of the order taxing defendants' electronic discovery costs is reversed and remanded for the trial court to exercise its discretion regarding those costs in accordance with applicable law.  Defendants are entitled to costs on appeal. (Cal. Rules of Court, rule 8.278.)

_____
Rodríguez, J.*

WE CONCUR:


_____
Simons, Acting P. J.


_____
Burns, J.


A155999/A156610/A156710


_____

* Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.